ROGERS v. HILL et al.

SAME v. TAYLOR et al.

District Court, S. D. New York.

March 27, 1940.

Evan Shelby, of New York City, for plaintiff.

George Z. Medalie, of New York City, for defendant George W. Hill.

Clarence J. Shearn, of New York City, for defendants Neiley, Riggio, and Taylor.

Chadbourne, Wallace, Parke & Whiteside, of New York City, for defendant American Tobacco Co.

Samuel L. Chess, of New York City, for Abraham M. Forman.

Joseph Nemerov, of New York City, (Edward A. Rothenberg, of New York City, of counsel), for Tillie S. Wile.

Milton Paulson, of New York City, for Esther Heller.

Gates & Levitt, of New York City (Abraham N. Geller, of New York City, of counsel), for William Frisch.

Samuel A. Mehlman, of New York City (Herbert S. Shapiro, of New York City, of counsel), for Ruth J. Yaeger.

Abraham M. Glickman and Nathaniel H. Mandelker, both of New York City, for Minnie Mandelker.

Nathan B. L. Cosel, of New York City (Robert V. Cosel, of New York City, of counsel), for William Cohn.

LEIBELL, District Judge.

Seven applicants seek leave to intervene in this action, as parties plaintiff, and as part of their prayer for relief ask that the court set aside a decree of this court,

dated July 13, 1933, which vacated an injunction pendente lite and dismissed this action without costs. The applicants all allege that they are stockholders of the defendant, The American Tobacco Company, and that they should be admitted as parties plaintiff on the ground that the action was dismissed as a result of a fraud on the court, to which the plaintiff Rogers, also a stockholder, is alleged to have been a party. For reasons hereinafter stated, I have concluded that no fraud has been shown, that the decree of dismissal dated July 13, 1933, should not be vacated, and that the petitions for permission to intervene in this action should be denied.

The dates of the petitions for leave to intervene are as follows:

| | |
|---|---|
| Abraham M. Forman | — August 14, 1939 |
| Esther Heller | — August 18, 1939 |
| Tillie S. Wile | — September 29, 1939 |
| William Frisch | — September 29, 1939 |
| Ruth J. Yaeger | — October 11, 1939 |
| Minnie Mandelker | — November 28, 1939 |
| William Cohn | — December 13, 1939 |

Paragraphs 3 and 4 of the Cohn petition and all of his bill of intervention are the same as certain paragraphs of the Wile petition and all the Wile bill of intervention. Apparently Cohn's lawyer copied the Wile papers. The Mandelker petition is based on the Frisch petition, which it either paraphrases or copies ad lib. Mandelker's lawyers must have used the Frisch papers. The Cohn and Mandelker petitions will not be discussed further. This form of plagiarism should be condemned. The Wile petition and bill of intervention are the same as those of Forman. But Wile's attorney states in his brief that this was by arrangement with the lawyer for Forman. These petitioners should have joined in the one petition, or else Wile should have been content with the Forman and Heller petitions already on file. Wile's lawyer states that he did not know of the filing of Heller's petition. The Heller and Frisch petitions have no proposed bill of intervention annexed; the Forman and Yaeger petitions have.

■ If the so-called bill of intervention is a pleading which sets forth the claim for which intervention is sought it would meet the requirements of Rule 24(c) of F.R.C.P., 28 U.S.C.A. following section 723c. But it is doubtful that Rule 24, relating to intervention, applies to this litigation, since the litigation was not pending when the Federal Rules of Civil Procedure went into effect, September 16, 1938.

(See Rule 86). McCrone v. United States, 307 U.S. 61, 65, 59 S.Ct. 685, 83 L.Ed. 1108; Hill v. Ohio Casualty Ins. Co., 6 Cir., 104 F.2d 695, 696.

■ I think that former Equity Rule 37, 28 U.S.C.A. following section 723, applies. It has been held that said rule was merely declaratory of the established equity practice relating to intervention. Rule 24 F.R. C.P., specifically permits intervention where a plaintiff's representation is inadequate for the protection of the applicant's interests, and it is asserted that Rogers' alleged collusion with the defendant directors makes his representation inadequate. But under Equity Rule 37 intervention may be granted for that reason too, although it is not specified in the rule; and at any time "when it is necessary to do so to preserve some right which cannot otherwise be protected", intervention may be granted. United States Casualty Co. v. Taylor, 4 Cir., 64 F.2d 521, 527. The main question here presented is the right to intervene. Whittaker v. Brictson Mfg. Co., 8 Cir., 43 F.2d 485, 490; Ayer v. Kemper, 2 Cir., 48 F.2d 11, 13. If for reasons hereinafter stated the right to intervene should be denied, there is no need of discussing what procedure petitioners should follow or what other relief they might be entitled to if they were given the status of intervenors.

Forman's notice of motion prays for an order:—

"(a) granting leave to the petitioner herein to intervene as a party plaintiff in the above entitled cause and for leave to file a bill of intervention in the form annexed hereto;

"(b) vacating and setting aside the said order of this Court dated July 13, 1933;

"(c) reinstating the said order of this Court dated March 24, 1932;

"(d) that the control and charge of the above entitled cause be vested in the petitioner herein;

"(e) setting aside a settlement agreement dated July 12, 1933, entered into between George W. Hill, Charles F. Neiley, Vincent Riggio, Thomas R. Taylor, Paul M. Hahn and the American Tobacco Company;

"(f) that the above entitled cause be set down for trial for a day certain to be fixed by this Court;

"(g) and for such other and further relief as to the Court may seem just and proper, upon the ground that the said agree-

362

ment, dated July 12, 1933 was entered into, and a resolution of the Board of Directors of the same date was adopted, upon considerations not appearing in the record of this Court, but solely for the illegal and improper purposes more fully set forth in the supporting papers, and on the ground that the said order of this Court, dated July 13, 1933 was made and entered in contemplation of said resolution and agreement, and upon the considerations therein expressed, and also upon the considerations recited in the said order, and upon no other considerations, and on the further ground that the representation of the petitioner's interest in the above entitled cause is inadequate."

The alleged fraudulent conduct of Rogers, as set forth in the supporting papers, is that he received from The American Tobacco Company a net fee of $263,000, plus the payment of his income tax thereon ($262,000) for his services in this and the other litigations which as a stockholder he had instituted against the individual defendants, directors of the defendant, The American Tobacco Company. This bonus action and two other suits attacking certain stock allotments and credits to the individual defendants, were settled on the same date, July 13, 1933, as one general settlement. It is charged that the three courts in which these actions were pending were not told the amount of Rogers' fee and that this was a fraud on the courts. Petitioner Forman also alleges that Chadbourne, Stanchfield & Levy received a fee of $320,000 in these matters, of which only $96,000 was paid by the individual defendants, the balance being paid by the corporation, and that this fact was not disclosed to any court. Assuming this to be so, Rogers knew nothing of it. The propriety of the fee to Chadbourne, Stanchfield & Levy will be later discussed. The charge against Rogers is made more bluntly by some of the petitioners—that the Rogers' settlement of his various litigations against the directors of The American Tobacco Company was induced by the payment to him of an excessive fee, for which he is alleged to have sold out the real interests of the stockholders. At least one of the petitions calls the Rogers' fee a bribe.

I have carefully examined all the affidavits and papers filed by the petitioners and have read the deposition of Rogers and the affidavits of others submitted in opposition. In my opinion Rogers completely refutes the charge that he settled his litigations against The American Tobacco Company directors because of any improper motives. Further, the record shows that he earned the fee he received and that through his services in the litigations he conducted in various stages through the appellate courts, he obtained for the defendant, The American Tobacco Company, benefits which at the time of the settlement had an actual value of $6,200,000 and since then have resulted in a further saving of about $2,250,000.[1] Additional savings to the corporation on future bonuses and on the 1930 employees' stock subscription plan will amount to many more millions.

The fee Rogers received was a reasonable fee. It was less than 8½ percent of the $6,200,000 of the actual and concrete saving obtained through restitution by the directors of credits and stock previously received. The May, 1939, issue of the Columbia Law Review contains an article in which are listed, at page 814, the fees paid to lawyers who, in recent years, have brought derivative suits for stockholder clients against corporate directors requiring them to account for acts of malfeasance and misfeasance. Percentages recently awarded have ranged between 20 percent and 33⅓ percent of the benefit obtained for the corporation. When Rogers' fee and the results he obtained are compared with the cases listed in the law review article, he appears to have been paid a very reasonable fee.

[1] I figure the $6,200,000 as follows:— Hill suit, New York Supreme Court, cash returned $960,000, plus a saving of $35.00 a share on 90,800 shares returned $3,178,000—total in the State Court action $4,183,000. In the 1930 employees stock subscription plan suit, eventually disposed of in New Jersey, 27,500 shares were returned on which the corporation saved $75.00 a share, or $2,062,500. (There is a further possible saving on the 283,556 shares not issued under the 1930 plan at the time the suit was settled, which may be issued pursuant to the terms of settlement only at a price that will take into consideration the market value). In the bonus action in this court the new basis for calculating the bonus, as fixed by the terms of settlement, has since resulted in a saving of $2,262,000 and there should be an annual saving of about $429,000, at a conservative estimate, for future years.

The elements to be considered in determining an attorney's fee are stated by Judge Woolsey in Re Osofsky, D.C., 50 F.2d 925, 927, based on a summary of testimony given by William G. Choate and David B. Ogden on a reference many years ago—"They laid down the following elements as being matters properly to be considered when the fees of an attorney have not been agreed on beforehand, but are to be fixed: (1) The time which has fairly and properly to be used in dealing with the . case; because this represents the amount of work necessary. (2) The quality of skill which the situation facing the attorney demanded. (3) The skill employed in meeting that situation. (4) The amount involved; because that determines the risk of the client and the commensurate responsibility of the lawyer. (5) The result of the case, because that determines the real benefit to the client. (6) The eminence of the lawyer at the bar, or in the specialty in which he may be practicing."

The circumstances under which Rogers instituted the stockholders actions in this court, in the New York Supreme Court and in the Chancery Court in New Jersey, are set forth in his affidavit, sworn to October 31, 1939, and filed in opposition to the Forman application to intervene herein. His affidavit also sets forth a complete summary of the various steps in these litigations, the legal services rendered during a period of 2½ years in state, federal and appellate courts; the settlement arrived at and the benefits obtained for The American Tobacco Company as a result of the settlement. The importance and the extent of his legal services cannot be questioned.

Rogers and his family had a very substantial interest in The American Tobacco Company; 6200 shares were owned by them as compared with the total of 520 shares owned by the seven petitioning intervenors. Every stockholder, no matter how small his holdings, has the right to be heard and through litigation may compel directors to account for their misdeeds. But when we come to weighing charges of fraud and bribery, against a stockholder who alone carried the burden of almost three years of litigation, the substantial interest of this litigating stockholder is not to be ignored. Any one who reads carefully the Rogers's affidavit of the legal services he performed in these litigations must be impressed with the amount of time he gave to these suits and the skill he displayed in successfully opposing the best legal talent the defendants could hire. The amount involved in these suits was large and the results Rogers obtained were of very substantial benefit to the corporation.

Rogers did not go into this litigation in order to develop some law work for himself. As a stockholder of The American Tobacco Company he received a notice in the summer of 1930 that a special meeting of stockholders would be held to pass upon a proposed employees' stock subscription plan in which the directors, as employees, were to be eligible to participate. Rogers had a representative attend the meeting and give notice on his behalf that if the stock was sold under the plan at less than the market price, he would attempt to hold the directors responsible in court. About six months later he read in the newspapers that the corporation was selling stock to the employees and officers at $25 a share although the market price was $112 a share. ·He wrote the corporation and asked that it take legal proceedings to enjoin the fulfillment of this declared purpose. He received no response, so he prepared a draft of a complaint in an action against the directors in the Supreme Court, New York County. The corporation refused him any information and he was obliged to get a mandamus to obtain access to the corporation's books wherein he found the record of other payments and credits to the directors which led to the institution of other stockholders' actions by him.

Rogers appeared "in sua persona" and acted as his own attorney, except as a matter of record in the New Jersey court in which he was not admitted to practice. Prior to these litigations he had attained real eminence at the bar and was considered a reputable and able attorney. President Theodore Roosevelt had appointed him general counsel of the Isthmian Canal Commission. He became head of the Department of Law and Administration of the Canal Zone. He was a director of the Panama Railroad and at one time its general counsel. Later he was the general counsel of the Interborough Railroad in New York City, for about eleven years. In these stockholders' litigations against The American Tobacco Company directors he prepared all his own legal papers, wrote his own briefs and argued the motions and appeals in all courts. Indeed, on the argument of the present applications for

leave to intervene, the attorneys for the applicants were pretty much in agreement that the amount of the fee Rogers received on the settlement of his lawsuits was reasonable.

But the applicants urge that, even assuming the fee to be reasonable, Rogers concealed from the courts the fact that he was receiving a fee. We must first consider, in weighing that charge, whether there was any duty imposed on Rogers to state to the courts in which his stockholders' suits were being settled the fact that he was getting a fee and the amount thereof. Any judge passing on a settlement of any of the Rogers' suits would naturally assume that Rogers was receiving a fee and that The American Tobacco Company was paying it, in view of the fact that Rogers had conducted these litigations for almost three years and was concluding a very satisfactory settlement, the terms of which were set forth before all of the courts in which the pending litigation was settled. In the Chancery Court in New Jersey, after a hearing on notice, it was found that the complainant stockholders (of whom Rogers was one and Matthews, a late starter, was the other) had "agreed to a fair and just basis for the final settlement and disposition of all issues" in that litigation which involved the so-called 1930 employees' stock allotment plan. The terms on which all the lawsuits were being settled were explained to Judge Sheintag in the New York Supreme Court action, in which the 1929 and other stock allotment plans were involved, on some of which restitution had been made by the defendants after they had filed their answer. Likewise before Judge Caffey in this court the disposition being made of all the lawsuits and the terms of the general settlement were fully explained. On July 12th, 1933, it was understood that Judge Caffey would dismiss the bonus suit in this court on the terms set forth in the proposed decree of dismissal, if the chancellor in New Jersey approved the terms of the settlement of the issues in that court.

█ We must not lose sight of the fact that the settlement in July, 1933, was a general settlement, that it contemplated the disposition of all the pending stockholders' suits and that the fee Rogers received covered his services in all of these suits. The fact that it was a general settlement has a bearing also on the adequacy of the settlement of the bonus action in this court.

Some of the counsel for the present applicants argue that the court on these present applications cannot consider all that Rogers recovered for the corporation in all his lawsuits, but only the benefits the corporation received from the settlement of bonus litigation in this court, in determining whether Rogers made a proper settlement of the bonus litigation. I do not agree with this contention. These applicants claim that Rogers failed to get a fair settlement of this bonus action and that he so failed because he was paid a large fee, which admittedly he had earned on the whole general settlement.

█ It is not uncommon for a litigant who has several causes of action against a defendant to receive, on a general settlement, an amount or a consideration for one of his causes of action which in and of itself, without considering what he received on his other suits, might seem insufficient. We must look to the terms of the general settlement in order to form a fair and just opinion. But even if we disregard the benefits the corporation received in the settlement of the New Jersey Chancery suit and in the New York Supreme Court suits and consider only what was accomplished in the settlement of this bonus suit, I cannot say that the terms of settlement of the bonus action were so improvident as to suggest fraud. While no refund was obtained of bonuses already paid, which allegedly were in great part illegal (the total amount involved was about $10,000,000), there was an adjustment of the base on which the bonuses were to be calculated in the future, which resulted in a saving of about $430,000 a year. The United States Supreme Court had held that the 1912 by-law, under which the bonuses had been paid, was not in itself invalid, and had referred the case back to the District Court to "determine whether and to what extent payments to the individual defendants under the by-laws constitute misuse and waste of the money of the corporation". Rogers v. Hill, 289 U.S. 582, at page 592, 53 S.Ct. 731, 735, 77 L.Ed. 1385, 88 A.L.R. 744.

Rogers was examined before trial on November 29, 1939, in a suit instituted by several of these present applicants in the Supreme Court, New York County, against the defendant directors, Rogers and others, to recover, among other things, the fee paid to Rogers in July, 1933, on the settlement of his stockholders' suits. In the

course of that examination he was asked why he had made the settlement of the bonus action without recovering any part of the bonuses which had been paid from 1921 to 1930. His explanation was as follows:

"Then we came down to the question of the bonus suit. Well, naturally, I raised the question of whether these individual defendants who received these bonuses would contribute, would pay back, any money, and they took a very powerful position on that and stated that they weren't in a situation to pay any substantial sums of money, they had been bothered with income taxes, and I don't know what other arguments were put up.

"I realized myself that if we went on and fought this question as to whether these payments could be justified or not, they could assemble an infinite amount of testimony on the subject, and the trial of the thing would last through maybe a series of years and it would result perhaps in uncollectible judgments against them, that is the way it appeared to me. So there was a counter-proposition made, that instead of that, that they would be willing to reduce the amount of the bonuses that they received under this by-law which the Supreme Court had sustained as valid, and that is the formula which everybody is familiar with.

* * * * *

"There was another important consideration which impressed me at the time and which I thought I was bound to take advantage of. There was a by-law sustained by the Supreme Court of the United States, and it had to be accepted. I had brought an action predicated upon the bonus and salary payments made to the officers and directors of the Company for certain years prior to the year in which I instituted the suit, but I recognized at once that that didn't dispose, even if I prosecuted that thing on to a judgment and got a favorable judgment, of the question as to what salaries the officers would be entitled to receive in every succeeding year."

* * * * *

"I couldn't imagine that if I had carried on a litigation with these officers for years over that question of their compensation and where they would be confronted with the possibility of a large judgment against them which they could not meet, it would not certainly upset the management of the company. I thought it would, and I have tried to make it plain. If you will look in my brief in the Supreme Court of the United States you will find that statement made, that I was not finding any fault with the actual commercial operations of the company or the management of it in that respect, which I thought had been efficient. I never took any other position about it. When I was asked about the status of the litigation I then made the observation that I thought if it could be settled on terms that were fair and just to the company, it would be for the interest of the company to settle the suit and to get the matter out of the courts."

* * * * *

"Their argument related more to the fact that these gentlemen weren't in any situation, if I got a very large recovery against them as a result of a prolonged litigation, to meet any very enormous judgment, and then I realized that if they were telling me the truth, which I suppose they were, I could not disprove it, and that would have the effect of unsettling the management, and that would be disadvantageous to the general operation of the company."

Rogers was not complaining of the commercial operations of the corporation under the management of its officers and directors. He complained of their greed in compensating themselves excessively for what they had done well.

The terms of settlement of all the Rogers stockholders' suits in July, 1933, were duly published at the time. They were also reported at the next meeting of stockholders and approved. Nothing was said about any attorneys' fees, but surely no one expected that all of Rogers' services were rendered gratis. If Rogers had received a grossly excessive fee, there might be some basis for arguing that the fee was made excessive in order to influence his judgment in settling the lawsuits. But his fee was moderate and undoubtedly these present applications would never have been made if it were not for certain facts developed in the trial of the Manton case and in the Levy disbarment proceeding. But none of those facts reflect on the honesty of Rogers. Counsel for the applicants herein admitted on the argument that the corruption testified to in the Manton case in no way tinged the final settlement herein. What Levy may have cabled Hill as Levy's opinion of Rogers—he termed Rogers "a high class hold-up artist"—is no reflection

on Rogers who stood out against all their efforts to buy him off, to tire him out, or to frustrate him altogether by their interminable legal maneuvers. There is no logic in the argument that because Manton was convicted and Levy was disbarred it follows that Rogers, who persevered with his stockholders' suits to a successful settlement, was also corrupt. He was the intended victim of all the alleged intrigue. Although on three separate occasions Rogers received offers from the defendants to buy the 6,200 shares of stock he and his wife owned (title to which was in a holding company) he rejected these offers, and when negotiations for a settlement were under way he refused even to discuss the question of the amount of his fee until all the terms of settlement of his stockholders' suits had been agreed upon.

The present applicants and their attorneys know that unless they can show some fraud on the part of Rogers, there is no basis for their plea that this bonus action should be reopened, the decree of dismissal entered on the settlement herein vacated and the petitioners permitted to carry on the litigation in place of Rogers. So these applicants contend that there must have been something sinister in back of the settlement because Rogers' fee was not disclosed to any of the judges, and a point is made that it was paid by bank cashier checks. There is nothing unusual, in using a bank's checks in a settlement. The lawyers for the plaintiff in the Matthews suit in New Jersey also received the same kind of checks. Every one of the judges who had any part in consummating the settlement must have assumed that Rogers would be paid for his legal services and by the corporation of course. Meighan v. American Grass Twine Co., 2 Cir., 154 F. 346. If the directors, the individual defendants, had paid Rogers a fee there would be reason to suspect Rogers. The directors were not obligated to pay his fee; the corporation was and the corporation paid it. Meighan v. American Grass Twine Co., supra. The directors who were being sued took no part in the approval of Rogers' fee at the meeting of directors at which the fee was approved.

There is nothing in the record to indicate that in the course of the thorough hearing on the settlement before Chancellor Fallon in New Jersey any question was raised as to the fee Rogers was to receive. Evidently Judge Shientag did not go into it when the terms of the general settlement were explained to him at the time he was asked to sign an order dismissing the New York Supreme Court action. Judge Caffey did ask Rogers if he wanted the judge to fix a fee for Rogers' legal services, and Rogers replied that it was not necessary, that that had been arranged. If it were necessary that the court fix the fee, it is reasonable to assume that some one of the three judges would have required that this be done before he signed the order or decree submitted on the settlement. Counsel have been unable to cite a case which holds that under the practice prevailing in 1933 it was necessary that the court fix the attorneys' fee on the settlement of a stockholder's derivative and representative action. In some cases that was done but there was no rule or practice which prevented the corporation and the attorney for the stockholder from arriving at a figure as a reasonable fee for his services. I think that the better practice was and is to have the court fix the fee. But if that were an essential requirement on the settlement of a stockholder's suit in 1933, would three distinguished judges, in as many different courts, overlook it? We did not then have the practice that now prevails under Rule 23(c) requiring notice to stockholders on the settlement or dismissal of a shareholder's derivative action.

Rogers has explained that since this was a general settlement, involving suits in three different courts, no one court could fix the fee for his services in the litigations in the other two courts. Further, the services and the results obtained had to be viewed as a whole. If the amount Rogers received was fair and reasonable, what difference would it make if it resulted from a private arrangement or was fixed piece-meal by the three courts after a hearing. We have the right to assume that a just judge would make a fair allowance, having in mind the essential elements to be considered in fixing that allowance.

The petitioners who now seek to intervene, and who were stockholders at the time Rogers was carrying on these litigations single handed, never offered to intervene at that time or to help defray the expenses of the litigation. They knew the terms of the settlement and as stockholders they were substantially benefitted thereby. Now they seek, in other lawsuits, to recover from Rogers the reasonable fee he re-

ceived, and they ask to reopen this lawsuit to see if they can recover some part of the 1921–1930 bonuses.

Although Forman in paragraph (e) of his notice of motion sought as part of his relief that the court enter an order "setting aside a settlement agreement dated July 12, 1933, entered into between George W. Hill, Charles F. Neiley, Vincent Riggio, Thomas R. Taylor, Paul M. Hahn and the American Tobacco Company", his attorney on the argument and in his brief now withdraws that part of his prayer on the ground that there was no settlement in July, 1933. The resolution adopted by the Board of Directors on July 12, 1933, and the agreement signed by the directors with the corporation on the same day made the readjustment of future bonuses under Article XII of the by-laws and the adoption of a new policy in respect to the 1930 stock allotment plan, conditional upon the settlement of the New Jersey and the New York Supreme Court actions, involving stock allotments, and the settlement of the bonus action in this court. I don't see how the benefits of the settlement could be retained under two of the lawsuits and in effect set aside as to one, by reopening this bonus action. Certified copies of the agreement of settlement between the directors and the corporation, and of the resolution of the Board of Directors, both dated July 12, 1933, were before Judge Caffey when he was considering the proposed decree of dismissal herein and they were filed with the clerk of this court together with the decree.

A further argument advanced by petitioners to show that a fraud was perpetrated upon the court is based upon a recital in the decree of dismissal signed by Judge Caffey July 13, 1933, as follows: "Whereas, plaintiff, individually and as a stockholder, and acting in the interest and on behalf of the stockholders generally of The American Tobacco Company, believes it to be to the best interests of The American Tobacco Company and its stockholders to terminate this litigation upon the considerations hereinafter set forth; and no other person having intervened or sought to intervene herein;" Petitioners argue that Rogers' fee as an attorney was not set forth in the order, that it was a consideration for the termination of the litigation, and therefore that the order submitted contained a false recital. The order did recite correctly the "terms" of settlement.

The word "considerations" means just that, as the whereas clause immediately following indicates, to wit: "Whereas, the parties hereto have duly agreed on said terms and accordingly have stipulated:—" Then follow eight paragraphs relating to the readjustment of bonuses for the future, and two paragraphs relating to the cancellation of directors' subscriptions for 27,500 shares of Common Stock B referred to in paragraph 8 of the amended complaint and the cancellation of certain credits to the directors described in paragraph 7 of the amended complaint in the action in this court. The "consideration" and the "terms" of settlement mentioned in Judge Caffey's decree of July 13, 1933, related to the settlement of the claims asserted by the stockholder Rogers against the defendant directors because of certain acts of malfeasance or misfeasance of the directors alleged in the amended complaint. The same thought was put more precisely in part of the preamble to the July 13, 1933, decree of the chancellor in the New Jersey action, by using the expression—"that said issues are concluded on the terms hereinafter set forth".

The fee, and the terms of settlement of the issues involved in the litigation, were something separate and distinct. Rogers has testified that in the negotiations leading up to the settlement he refused to discuss the amount of his fee until the terms of the settlement were agreed upon. He dictated a memorandum of the terms after they were agreed to and before any arrangement was made as to his fee. That memorandum appears at pages 51 to 55 of Rogers' deposition taken November 29, 1939. One of the concluding paragraphs of the memorandum is as follows: "The question of fees is to be left open to immediate adjustment, and it is understood that the terms of this settlement are contingent upon the agreement with respect to the amount of the fees, which, if not agreed upon, will permit either party to withdraw."

Into that paragraph petitioners also read a fraudulent intent upon the part of Rogers. They argue that he reserved the right to toss the settlement aside, regardless of its benefit to the corporation, unless his demands as to fees were met. But the reservation could be used by the defendants also as a basis for refusing to go through with the settlement, unless Rogers agreed in advance to a proper fee. If the amount of his fee were not agreed upon, "either

party" could withdraw from the settlement. It may be that the attorneys for the corporation feared that on the settlement such as had been outlined, Rogers might have sought from the court a fee of 25% of the value of the recovery and the benefits he was obtaining for the corporation and in that event Rogers' fee might have been several times the amount the corporation finally paid. There is no basis for assuming that the defendant corporation, its officers, directors and their attorneys wished to be generous to Rogers. After all the defendants had done, jointly or severally, openly or surreptitiously, to frustrate him for three years, he was at last and single-handed bringing them to book. They liked him so little that even then, with a settlement agreed upon, they wanted to be rid of him altogether, so they offered to buy his 6,200 shares of stock instead of paying him a fee.

Rogers in his deposition (December 1, 1939) describes his conference on the fee as follows: "I went in there when the question of fees came up, and I think I stated to him that a friend of mine had suggested to me something like a million dollars, but I didn't want to take it up on that basis. What I wanted was a net fee which would provide for my income tax. I did not want that hanging over my head for two or three years, or, if I should happen to drop off, over my family. I wanted a lesser fee fixed which would provide for the income tax. Then Mr. Whiteside, as I recall, took up again some question about buying the stock, and I told him that was not only impractical, but that I would not consent to it. I pointed out that if I could carry through a settlement on any such basis, it would result, since some of that stock was in a personal holding company of mine, in a double taxation. He finally said he understood that, and he abandoned all suggestion of any settlement on that basis, and he made some figures along that line, it seems to me—I am not certain about that. Then I thought I ought to have a net fee somewhere along about $300,000, and he made some figures. However, he would have to testify to that. I thought it was in connection with the abortive talk about the stock deal, but he had that figure of $263,000. I said, 'Oh, well, let it go at that, provided the income tax is covered,' and that was all about that. And then the subsequent conversations had no connection with the fee, * * *."

In the early stages of the Rogers' litigations, and also after the argument but before the decision of the bonus appeal by the United States Supreme Court, the defendants had twice offered to buy Rogers' stock. He refused each time. He also refused a third offer to that effect, as shown above. All this serves to undermine the basis for any charges of fraud against Rogers. But the petitioners see evil in Rogers' reference to his personal holding company and the possibility of double taxation if he sold his stock, although they made no point of it while cross-examining him. The petitioners argue that the real reason Rogers refused the offers to buy his stock was the fear of double taxation, not because he was adhering to ethical standards that he felt bound to maintain as a reputable member of the bar. He testified he "would not consent" to the suggestion that he sell his stock. It may have been impractical also, but that was secondary. He had rejected the second offer to buy his stock with the rejoinder "That is out of the question, and I have always objected to that." The first time he was approached with an offer to buy his stock after the decision of the New York Court of Appeals allowing an examination of the corporation's books, he had told the intermediary:—"I can't do it. I can't sell the stock. I can make no settlement of this suit except on the basis of a court decree where the benefits of the recovery go directly to the American Tobacco Company." He never departed from that purpose.

▮ Petitioners urge that if the decree of dismissal herein is not vacated and this action reopened, they will be unable to attack the bonuses paid between 1921 and 1930, because of the statute of limitations. Cwerdinski v. Bent, 256 App. Div. 612, 11 N.Y.S.2d 208, affirmed 281 N.Y. 782, 24 N.E.2d 475. They state that in certain suits in the New York Supreme Court which they instituted in 1939 and which have been consolidated, wherein they attack all bonuses paid under Article 12 of the by-laws, including the 1921–1930 period, the defendant directors have in that litigation pleaded the statute of limitations. Petitioners wish to reopen this action to avoid the statute and with that purpose in mind petitioners urge that the Rogers settlement of this action was both fraud-

ulent and improvident. I have concluded that there was no fraud in the settlement. As to its alleged improvidence, I do not believe that alone would provide the basis for the relief petitioners seek. If petitioners were stockholders at the time of the settlement they must have heard of the terms of settlement which were widely publicized. If they were not satisfied with those terms, they should have raised the issue at that time either at the stockholders' meeting which approved the terms, or by appropriate court action on their own part. If they were not stockholders at the time of the transaction of which they complain, then Rule 23(b) of the Federal Rules of Civil Procedure, and former Equity Rule 27 and the doctrine of Hawes v. Oakland, 104 U.S. 450, 26 L.Ed. 827, must be reckoned with, especially if the period involved is also barred by the state statute of limitations. The delay herein on petitioners' part in taking action to attack the settlement of the bonus action on the ground that it was improvident, would constitute laches.

 The argument is also advanced that the decree of dismissal should be vacated because the corporation should have had, at the time the terms of settlement were being discussed, an attorney, other than the law firm that was also acting for the director defendants. If the corporation itself were dealing with the director defendants and if it were not otherwise represented in the negotiation of the settlement, there might be something to this contention. The corporation was a nominal defendant. It would have been the plaintiff if it had complied with the demand Rogers made that the corporation bring suit, before he instituted his shareholder's action. The owner of the primary right, the corporation, refused to enforce that right, so Rogers, a shareholder, a member of the class that possessed the secondary right, brought his derivative action against the directors. In the negotiations for the settlement of the issues raised by the pleadings in the various actions, he represented the corporation. Meighan v. American Grass Twine Co., 2 Cir., 154 F. 346, 347. The corporation was properly and necessarily represented by him. He controlled the action. Brinckerhoff v. Bostwick, 99 N.Y. 185, 194, 1 N.E.

663; Hirshfeld v. Fitzgerald, 157 N.Y. 166, 51 N.E. 997, 46 L.R.A. 839; Ayer v. Kemper, 2 Cir., 48 F.2d 11, 14.

 The fact that an injunction pendente lite had been obtained, and was reinstated by the United States Supreme Court decision in the bonus action, was not such an adjudication of the controversy as would bar the plaintiff stockholder from settling the suit; nor was the ruling of the Supreme Court that the District Court had the right to inquire into the bonuses paid such an adjudication. No such inquiry was ever made. The action had not been prosecuted to judgment. If it had, Rogers would have "ceased to have control over it, because the rights of the other stockholders would at once have attached thereto". Brinckerhoff et al. v. Bostwick et al., 99 N.Y. 185, 194, 1 N.E. 663, 668. Further, if there were any basis for any such contention on petitioners' part, it would not raise any issue of fraud but a legal question purely, and petitioners' laches would bar any consideration of that point at this late date. Rogers could settle the litigation and he did, on terms he considered to be to the best interests of the corporation. That accounts for the recital in the second paragraph of Judge Caffey's decree of dismissal dated July 13, 1933. Judge Caffey very carefully wrote in a further recital, to wit:—"and no other person having intervened or sought to intervene herein." This settlement was made years prior to the adoption of our new Federal Rules of Civil Procedure. Now, under Rule 23(c), a dismissal or compromise of a stockholder's action against directors cannot be had except upon the approval of the court and on notice to all other stockholders.

 Counsel for applicants argue that Judge Caffey's decree of dismissal of July 13, 1933, should be set aside because the corporation improperly paid the fee of the attorneys for the defendant directors. Chadbourne, Stanchfield & Levy appeared as attorneys in this bonus action for both. For their legal services in this action and in the New Jersey and the New York Supreme Court action they received a fee of $320,000. Of that sum the individual defendant paid $96,000; the corporation paid the balance. Several lawsuits are now pending to re-

cover the sum the corporation thus paid. Chadbourne, Stanchfield & Levy state that out of the sum paid to them they in turn paid special counsel on the appeals, such as John W. Davis and Nathan L. Miller, and that the corporation had the right to oppose plaintiff in these suits because there was involved therein the validity of Article 12 of the by-laws and also certain employee stock allotment plans which had been approved by the stockholders. Admittedly the corporation could not legally pay these attorneys for any services they rendered the directors in resisting the stockholders' suit. Apfel v. Auditore, 223 App.Div. 457, 228 N.Y.S. 489, affirmed 250 N.Y. 600, 166 N.E. 339; Monahan v. Kenny, 248 App.Div. 159, 288 N.Y.S. 323. The issues as to Chadbourne, Stanchfield & Levy's fee will have to be determined in other pending actions. But the facts alleged fall far short of a showing of any fraud which could form the basis for setting aside Judge Caffey's decree of dismissal of July 13, 1933.

■ The attorney for Wile, in an affidavit filed on this motion, states that he makes the testimony of Levy, of Hahn and of Rogers, in the Levy disbarment proceedings, part of the record on these present applications. This cannot be done. None of the parties to this bonus action (except Hahn) had any right to cross-examine those witnesses in the Levy proceeding. On the argument of these motions I stated that all counsel might offer certain pages of the Levy record by referring to them specifically in their affidavits and briefs. There was no objection to that arrangement. But to offer great blocks of the Levy record is going beyond that ruling. The deposition of Rogers taken in a New York Supreme Court action on November 29, 1939, which the petitioners and parties in these present proceedings stipulated could be read in evidence in this proceeding, is in a different class. There is no such stipulation in respect to any of the testimony in the Levy disbarment proceeding. No request was made to take the testimony of any witness on these motions for leave to intervene, although the opportuniy to do so was offered by the court.

As I stated above, the main question presented is should these applicants be permitted to intervene in this action. In my opinion they have not made out a case for intervention and their motions are accordingly denied. Submit orders on notice.