### TEX–PENN OIL CO. v. COMMISSIONER OF INTERNAL REVENUE.

### BENEDUM v. SAME.

### PARRIOTT v. SAME.

Nos. 5979–5981.

Circuit Court of Appeals, Third Circuit.

April 17, 1936.

John W. Davis and Montgomery B. Angell, both of New York City, Weston Vernon, Jr., of Washington, D. C., J. C. Adams, of Tulsa, Okl., and Harry Friedman, of Washington, D. C., for all petitioners.

John S. Weller and John O. Wicks, both of Pittsburgh, Pa., for petitioner Benedum.

Frank J. Wideman, Asst. Atty. Gen., and J. Louis Monarch and A. F. Prescott, Sp. Assts. to Atty. Gen., for respondent.

Before BUFFINGTON, DAVIS, and THOMPSON, Circuit Judges.

DAVIS, Circuit Judge.

The three above-entitled causes, involving substantially the same questions, were heard together by the United States Board of Tax Appeals and were disposed of in a single opinion.

The issues raised relate to the taxability of a certain stock transaction as hereinafter stated.

In 1917 five persons, M. L. Benedum, F. B. Parriott, J. L. Kirkland, W. E. Wrather, and H. B. Lantz, hereinafter called the lessees, acquired thirty-one undeveloped oil and gas leases, known as the "Duke-Knoles leases,"[1] covering approximately 4,000 acres of land, principally in Comanche county, Tex. The lessor re- tained a one-eighth interest in the leases. Benedum owned six-sixteenths of the leases, Parriott three-sixteenths, Kirkland three-sixteenths, Wrather two-sixteenths, and Lantz two-sixteenths.

In the spring of 1918 drilling for oil was begun by them, and on September 2, 1918, the first well was completed. This well at first produced about 600 barrels daily. The initial work of drilling was begun and paid for by the lessees in proportion to their interests, but on October 31, 1918, they incorporated the Tex-Penn Oil Company, hereinafter called "Tex-Penn," under the laws of West Virginia, with a capitalization of $2,000,000, consisting of 80,000 shares of stock of $25 par value per share, for the purpose of taking over the development and operation of the leases.

Upon its organization the lessees subscribed for 4,000 shares in proportion to their interests in the leases. Cash to the amount of $100,000 was paid in for this stock which was immediately paid back by Tex-Penn to the lessees for a two-eighths interest in the leases. The lessees thus reserved a five-eighths interest in the leases, one-half of which was to be paid to Parriott, president and manager of Tex-Penn, to make up any deficit in its operation. A further reservation was made giving the lessees the right to purchase within five years the remainder of the Tex-Penn stock at par.

During the latter part of 1918 and the early part of 1919, Parriott, representing himself and the other lessees, purchased 9,120 shares of the stock of Tex-Penn, paying $25 a share, or an aggregate of $228,000. This added to the 4,000 shares made the total number of shares of stock outstanding and owned by the lessees 13,120. The total of $228,000 paid for the stock was spent by Tex-Penn in the development of the leases.

Tex-Penn continued the development of the leases, and on December 28, 1918, a well known as "G. W. Knoles No. 1" was drilled and produced 500 barrels daily. Later, in January of 1919, this well was deepened and it immediately began to produce 6,000 barrels daily. By July, 1919, twelve wells had been drilled upon the properties. The first well produced 600 barrels daily, the second 6,000, as above stated, the third gas, the fourth gas, the fifth 100, the sixth 25, the seventh gas, the eighth 120, the ninth 130, the tenth 530, the eleventh 50, and the twelfth was dry.

Early in 1919 Benedum and Parriott conceived the idea of consolidating various oil producing and refining properties and distributing facilities into a single company so as to constitute an integrated unit with facilities for the production, refining, and distribution of oil and gas products. At that time they were interested in or owned three other corporations known as the "Riverside Eastern Oil Company," incorporated under the laws of Delaware, the "Riverside Western Oil Company," incorporated under the laws of West Virginia, and the "Pittsburgh-Texas Oil & Gas Company," also incorporated under the laws of West Virginia. It was proposed to consolidate the properties of these companies with those of Tex-Penn and with the five-eighths interest in the Duke-Knoles leases which the lessees had reserved.

After conferring with certain bankers of Philadelphia and New York, the Transcontinental Oil Company, hereinafter called "Transcontinental," was incorporated under the laws of Delaware on June 18 1919, with 2,000,000 shares of stock of no par value "for the purpose of creating in this single corporation an integrated unit combining all the phases of the oil business from the production of crude oil to the marketing of the refined products."

The original estimate of cash necessary to carry out this transaction was $23,000,000 allocated as follows: $8,500,000 for working capital for Transcontinental; $12,000,000 to the five lessees as compensation for Tex-Penn properties, and for their individual interests in the Riverside Eastern and Western Companies and the Pittsburgh-Texas Oil & Gas Company; $1,250,000 each to the Riverside Companies to pay off their preferred stock at par. But the bankers, who were to finance this enterprise, were unable to raise more than $20,000,000 which required a deduction of $3,000,000 in order to put through the deal. It was proposed that the lessees consent to a reduction of $3,000,000 from the $12,000,000 they were to receive, but none would agree to a reduction except Benedum, who consented to a reduction of the entire $3,000,000 from his share.

Accordingly, there was conveyed to Transcontinental, the Tex-Penn properties, the five-eighths interest of the lessees in the leases, and all the properties of the Pittsburgh-Texas, Riverside Eastern and Riverside Western Companies. The bankers agreed to purchase 500,000 shares of Trans-

continental at $40 per share, amounting to $20,000,000 to be turned over to Transcontinental "to be used by it as working capital and for the acquirement of its properties." The bankers were to receive 25,000 shares of Transcontinental stock as their commission and further were to have the right to purchase 225,000 additional shares at $1 per share.

In the acquisition of the various properties by Transcontinental, Mr. J. M. Holliday acted as agent for that company and the bankers, and Parriott represented the lessees and Tex-Penn.

The plan was carried out. The Tex-Penn properties were to be transferred to Transcontinental free and clear of all encumbrances. In order to make a reliable estimate of the necessary amount, Transcontinental had an auditor examine the books of Tex-Penn, and it was his opinion that it would require $350,000 in addition to the $286,891.29 available for that purpose.

Three of the lessees, Wrather, Kirkland, and Lantz, did not want to continue with Transcontinental and demanded their share in cash rather than stock. They owned seven-sixteenths of the five-eighths interest of the lessees in the oil leases on the tract of land known as "Duke-Knoles Pool." Their share amounted to $5,250,000 and this they were to receive in cash. Accordingly Transcontinental paid and issued its stock as follows:

| | Cash | Stock Shares |
|---|---|---|
| Riverside Eastern | $ 1,250,000 | 41,666 |
| Riverside Western | 1,250,000 | 41,667 |
| Pittsburgh-Texas | | 158,833 |
| Parriott, attorney | 5,250,000 | ....... |
| Benedum and Parriott. | 3,400,000 | 1,007,834 |
| Tex-Penn | 350,000 | ....... |
| | $11,500,000 | 1,250,000 |

This $11,500,000 represented the $9,000,000 received by the lessees and the $2,500,000 allocated to the Riverside Companies to retire their preferred stock. The $3,400,000 paid to Benedum and Parriott was divided, $1,360,000 to Benedum and $2,040,000 to Parriott.

The bankers formed a syndicate to resell the 500,000 shares of the Transcontinental stock purchased by them. During the marketing of the syndicate stock, it was understood that no other shares would be placed on the market. This understanding

was carried out and no other stock was sold or pledged prior to February, 1920.

The bankers exercised their option to purchase the 225,000 additional shares of Transcontinental stock at $1 per share making the total cash paid in to Transcontinental for stock $20,225,000.

The primary question in this case is whether or not there was substantial evidence to support the finding of the board that Tex-Penn in exchange for its assets received *from Transcontinental* $350,000 as a cash consideration in addition to 1,007,834 shares of its capital stock.

The petitioners say that it received the stock only, while the commissioner says that it received $350,000 from Transcontinental as cash consideration in addition to the stock. If it received the stock alone, the transaction is not taxable under section 202 (b) of the Revenue Act of 1918 (40 Stat. 1060) and Article 1567 of Regulations 45 promulgated under and pursuant to this section. Section 202 (b) provides in part as follows: "When property is exchanged for other property, the property received in exchange shall for the purpose of determining gain or loss be treated as the equivalent of cash to the amount of its fair market value, if any; but when in connection with the reorganization, merger, or consolidation of a corporation a person receives in place of stock or securities owned by him new stock or securities of no greater aggregate par or face value, no gain or loss shall be deemed to occur from the exchange, and the new stock or securities received shall be treated as taking the place of the stock, securities, or property exchanged."

Article 1567 of Regulations 45 provides: "Exchange of stock for other stock of no greater par value. In general, where two (or more) corporations unite their properties, by either (a) the dissolution of Corporation B and the sale of its assets to Corporation A, or (b) the sale of its property by B to A and the dissolution of B, or (c) the sale of the stock of B to A and the dissolution of B, or (d) the merger of B into A, or (e) the consolidation of the corporations, no taxable income is received from the transaction by A or B or the stockholders of either, provided the *sole* consideration received by B and its stockholders in (a), (b), (c), and (d) is stock or securities of A, and by A and B and their stockholders in (e) is stock or securities of the consolidated corporation, in any case of no greater aggregate par or face value than the old stock and securities surrendered."

In order to relieve the transaction between Tex-Penn and Transcontinental from "taxable income," two things must have occurred.

The first is that they must "unite their properties" in one of the ways provided in the Regulations: "The sale of its property by B (Tex-Penn) to A (Transcontinental) and the dissolution of B." This was admittedly done.

The second thing that must have occurred is that "the sole consideration" received by B, the selling corporation, must have been the "stock or securities of A," the purchasing corporation.

The crux of this case arises here. Where did the $350,000 come from—from Transcontinental as part consideration or from the lessees individually? The commissioner says from Transcontinental; the petitioners say from the lessees individually. If it came from the lessees, it settles this case adversely to the commissioner.

For some time plans had been considered for the organization of Transcontinental, as above stated, and negotiations were going on between the bankers and the lessees for the purchase by Transcontinental of the properties of Tex-Penn, the Riverside Eastern Company, the Riverside Western Company, the Pittsburgh-Texas Company, and the Duke-Knoles leases. By July 24, 1919, terms and conditions seem to have been agreed upon for the properties. One of the conditions was that the properties of Tex-Penn should be conveyed to Transcontinental free and clear of debt. The lessees agreed to see that this was done. But Tex-Penn did not have on hand sufficient funds to meet its outstanding liabilities. So on July 14, 1919, Wrather, Kirkland, and Lantz wrote Parriott and directed him to deduct from their distributive share of the purchase price of the properties a sufficient amount "not exceeding, however, seven-sixteenths of Five Hundred Thousand ($500,000.00) Dollars to pay the debts and obligations of the (Tex-Penn) Company." In order to ascertain what amount would be necessary to pay Tex-Penn debts, Parriott directed one Ehrentrout, the Tex-Penn auditor, to examine the books of Tex-Penn and determine what amount would be required for that purpose. He did so and reported that approximately $350,000 would be required.

When the time arrived to reduce the terms of their negotiations to writing, Holliday took precaution to see that the provision for transferring the Tex-Penn properties free and clear of debt was expressly included in his offer and contract.

Accordingly, he wrote Tex-Penn on July 24, 1919 saying: "I hereby offer to purchase all of the properties and assets of the Tex-Penn Oil Company for a consideration of Three Hundred and Fifty Thousand Dollars ($350,000) in cash and One Million Seven Thousand Eight Hundred and thirty-four (1,007,834) shares of the capital stock of the Transcontinental Oil Company." On the same day an agreement was entered into between Benedum and Parriott, and Holliday, for the purchase of the Tex-Penn properties by Transcontinental, and the same language was used as to the $350,000. The directors of Tex-Penn on the following day held a special meeting and formally accepted Holliday's offer in the same language as to consideration. After Holliday stated in his offer that the $350,000 was consideration moving from Transcontinental, it naturally followed in the written agreement, formal acceptance, and tax return.

But notwithstanding these recitations in the papers, all of the parties to these negotiations and agreements perfectly well understood that the lessees were individually supplying the $350,000 for the purpose of paying the debts of Tex-Penn so that its properties might be transferred free and clear of debt.

This is shown and made clear by the letter written July 14, 1919, to Parriott by Wrather, Kirkland and Lantz, authorizing him to deduct from their distributive shares a sufficient amount to pay their part of the debts and obligations of Tex-Penn so that its properties might be transferred free and clear of debt. The portion of the $350,000 that each of the lessees paid is set out in the account of Parriott who acted as their attorney as follows:

W. E. Wrather....$ 43,750.00
J. B. Lantz........ 43,750.00
J. L. Kirkland...... 65,625.00
F. B. Parriott...... 65,625.00
M. L. Benedum.... 131,250.00
  Tex-Penn Oil.Co......... $350,000.00

The following statement was written under the above entry:

"To correct Journal entry page 5 distributing amount paid Tex-Penn by Transcontinental Oil Co. and deducted from M. L. B. (Benedum) and F. B. P. (Parriott) cash proceeds of sale of Duke-Knoles property to Transcontinental Oil Co., as this amount was to be apportioned against the sale price received by all the individual interests reducing such sale prices of 5/8 int. per agreement to following:

W. E. Wrather............$1,456,250.00
J. B. Lantz............... 1,456,250.00
J. L. Kirkland............ 2,184,375.00
F. B. Parriott............ 2,184,375.00
M. L. Benedum........... 1,368,750.00

  Total ................. 8,650,000.00."

It did not take the entire $350,000 to pay the debts of Tex-Penn. There was left a balance of $55,255.24. This was returned to the lessees as follows:

Tex-Penn Indebtedness Fund.. $55,255.24
 W. E. W. Tex-Penn Expense ................. 6,906.90
 J. B. L. Tex-Penn Expense ................. 6,906.90
 J. L. K. Tex-Penn Expense ................. 10,360.35
 F. B. P. Tex-Penn Expense ................. 10,360.35
 F. B. P. spec. Penn Expense ................. 20,720.73.

A consideration of all the documentary evidence drives us to the conclusion that the $350,000 was not consideration passing from Transcontinental to Tex-Penn, but was money furnished by the lessees as individuals to pay the debts of Tex-Penn so that the transaction might be made according to agreement. In determining tax liability on contracts, a party is not bound to accept the contract upon its face or the recitations therein, "but may burrow under the words used in the contract and by extraneous evidence, if necessary, determine the real agreement between the parties." United States v. Board et al. (D.C.) 14 F.(2d) 459, 460. In form the documents upon which the Board of Tax Appeals relied stated that the $350,000 was corporate consideration passing from Transcontinental, but in fact it was not, and the rule is well settled that in determining tax liability, taxing authorities must look through form to fact and substance.

It has been a long time since these transactions took place, and most of the parties who were interested in them are dead; but every living person who was in any way

connected with them testified without contradiction that the $350,000 was paid by the five lessees and not by Transcontinental.

█ In the individual cases of Benedum and Parriott, it is conceded, as we understand it, that they received Transcontinental stock in exchange for their stock in Tex-Penn. In any event the $350,000 went to the payment of the debts of Tex-Penn. The board in a long unsatisfactory argument infers that they received something other than stock or securities for their Tex-Penn stock and as a consequence are taxable on the transaction, but there is no evidence as distinguished from supposition to support such a theory. The facts in their cases bring them within section 202 (b) of the Revenue Act of 1918 and Article 1567 of Regulations 45, promulgated thereunder.

When all the facts are considered, there is no substantial evidence upon which the board could base its conclusion that the $350,000 was paid by Transcontinental or consideration moving from it to Tex-Penn so as to make the transaction taxable.

██ But assuming that we are in error in our conclusion that the $350,000 was not part of the consideration moving from Transcontinental to Tex-Penn for its stock and assets, did the 1,007,834 shares of Transcontinental have any "fair market value" for income tax purposes within the meaning of the Revenue Act of 1918 at the time of their transfer?

Transcontinental was a new company organized for the express purpose of developing new oil properties on a large scale. This was a very hazardous, speculative, and uncertain undertaking. The twelve wells which had been drilled were falling off and becoming definitely dry and profitless. The entire field which it was to develop was known to be "spotty." This development proved to be an absolute failure, a great financial loss, and entirely worthless. Another thing increasing the hazards in this case and rendering more uncertain any guess as to the value of the stock on August 1, 1919, was the existence of a restrictive agreement wherein it was agreed that the recipients of the Transcontinental stock would not sell or dispose of it during the life, 90 days, of the bankers syndicate with the right in the syndicate to extend the restriction for another 90 days. The determination of the value of the stock on August 1, 1919, was a mere speculative guess and a three or six months' restriction on its sale makes the guess wilder and more speculative. The cases cited by the board on this point are inapplicable for the reason that the restrictive agreement here "did not come into existence as the result of any voluntary or cooperative action between Benedum, Parriott and Tex-Penn, but, on the contrary, the bankers, as a condition of financing the transaction, 'exacted from Benedum and Parriott' the agreement." Under these facts, to fix with any certainty any real value for this stock for income tax purposes on August 1, 1919, was impossible. O'Meara v. Commissioner (C.C.A.) 34 F. (2d) 390; Nichols v. Commissioner (C.C.A.) 44 F.(2d) 157; Mount v. Commissioner (C.C.A.) 48 F.(2d) 550; Clarke v. Welch (D.C.) 46 F.(2d) 563; Humes v. United States, 276 U.S. 487, 494, 48 S.Ct. 347, 72 L.Ed. 667. This was the conclusion of six expert witnesses of wide experience and national reputation in valuing oil properties. The board ignored the testimony of these witnesses as it had to in order to reach the conclusion it did. It fixed the value of $7 a share for the stock, but just how it reached this figure is not disclosed. It certainly ignored all the evidence without showing that it possessed independent knowledge itself of the value of the properties or stock involved. Quoting from one of its former decisions, it said that "the problem of valuation has not been developed to the extent that any particular method of reasoning is authoritative or any particular class of persons recognized as experts," and finally said that $7 a share "represents our reasoned judgment of fair market value of the stock after studied consideration of all pertinent facts and applicable factors." What those facts and factors were is not disclosed. The board may not ignore and reject all the evidence as to value and reach a conclusion based upon other facts and factors without disclosing them. Its judgment, the board said, was based "on experience in many cases involving similar questions." What these other cases were and what facts and questions the board took into consideration, the parties were entitled to know, for they doubtless were different from those in the case at bar. The board might have said that the fair market value was $1, $10, or $40 a share and its reasoning would have been equally applicable. The board may not fix an arbitrary and excessive value. Boggs & Buhl, Inc. v. Commissioner (C.C.A.) 34 F.(2d) 859; Pittsburgh Hotels Co. v. Commissioner, 43 F.(2d) 345 (C.C.A.3); Russell v. Commissioner (C.C.A.) 45 F.(2d) 100; Williams v.

524

Commissioner (C.C.A.) 79 F.(2d) 518; Helvering v. Taylor, 293 U.S. 507, 55 S.Ct. 287, 79 L.Ed. 623.

■ There is no evidence in the record showing that the board or any of its members had any independent knowledge of the value of the properties of Transcontinental or of the value of the stock. True, the board may reject expert testimony and reach a conclusion in accordance with its own knowledge and judgment, but the record must show that it has such knowledge and this it did not do. The whole Transcontinental venture "blew up" shortly after August 1, 1919, and the stock became absolutely worthless. The petitioners graphically stated the facts as follows: "Now, to begin with, the Board has specifically found the results of Transcontinental's operations after August 1, 1919. Some twenty eight wells were drilled on the Duke-Knoles leases, of which three were dry holes and four gas wells, and the eleven producers had initials of 100 barrels or less. Following August 1, 1919, the total production during the next ten years was inconsequential, and operations from the Duke-Knoles leases resulted in a loss of $415,857. The $8,500,000 working capital was wholly dissipated in fruitless efforts, and the company was forced to borrow additional funds from Benedum and Parriott and others to keep going, until its credit was exhausted. The operations of Transcontinental up to December 31, 1924 resulted in a deficit of $6,254.400. Thus, in fact, the entire Transcontinental venture blew up and blew up almost immediately after August 1, 1919. Tested by the actual after events, a valuation of anything like $14,000,000 for the Company as a going concern is grotesque."

■ Subsequent events are material in testing the propriety of a valuation. Nachod & United States Signal Co. v. Helvering (C. C.A.) 74 F.(2d) 164; Sinclair Refining Co. v. Jenkins Petroleum Process Co., 289 U.S. 689, 53 S.Ct. 736, 77 L.Ed. 1449, 88 A.L.R. 496.

■ The formal notices of deficiency contained in the letters of the commissioner were abandoned and repudiated by the commissioner himself. The burden thereafter rested upon him to establish that a capital gain occurred and the amount of it. Helvering v. Taylor, supra. The commissioner changed his position from time to time as to the amount of tax due which varied from a few millions to seventy some odd millions. This continued from the first no-

tice of deficiency until after the trial. His final position is tersely stated by counsel as follows: "In fact, the figures which the commissioner voluntarily used in his computation filed with his brief after the conclusion of the trial amount to a solemn declaration that in framing his original formal determinations of deficiency he had (1) overstated the receipts as to Tex-Penn by some $36,000,000, as to Benedum by some $25,600,000 and as to Parriott by some $10,200,000; (2) understated the cost or basis as to Tex-Penn by some $850,000, as to Parriott by $252,000, and overestimated the cost as to Benedum by the amazing amount of some $16,000,000; and (3) overstated the deficiencies in taxes as to Tex-Penn in the amount of $16,878,856, and as to Benedum by $9,136,977, and as to Parriott by $7,778,103. In view of these changes of front, we submit that any 'presumption of correctness' which originally attached to the commissioner's formal determinations has now disappeared completely."

The three formal notices of deficiency indicate that they were arbitrary and excessive. In the Tex-Penn case, the notice stated that the deficiency was $22,067,960; the receipts were $48,272,506 (figured on a value of $47.55 a share) and a cost basis of $337,205, or a gain of $47,935,301. The board found a deficiency of $2,871,085 on receipts of $7,404,838 (figured on a value of $7 per share of the stock, plus the $350,000 held to be part of the consideration) on a cost basis of $1,188,364, or a capital gain of $6,216,474. Similar variances occur in the cases of Benedum and Parriott.

■ But assuming that the value of $7 per share of the Transcontinental stock, as found by the board, was the correct value at the time of the transfer, the record does not contain sufficient facts from which the cost can be found so that the gain may be determined with any reasonable degree of certainty. The cost of property sold is fixed under the statute by the value of what was given for it when acquired. Law v. McLaughlin (D.C.) 2 F.Supp. 601; Volker v. United States (D.C.) 40 F.(2d) 697; Rice v. Commissioner (C.C.A.) 47 F.(2d) 99; Jankowsky v. Commissioner (C.C.A.) 56 F.(2d) 1006; McKinney v. Commissioner, 32 B.T.A. 450. In the Tex-Penn case, it acquired part of its properties by the issuance of two blocks of stock, and there is nothing in the record from which the value of the stock when issued may be determined. It issued 4,000 shares of its stock for two-

eighths interest in the Duke-Knoles leases. Among the assets which it transferred to Transcontinental were certain "South American" properties and the Oldham and Sultan county properties. Tex-Penn acquired them a week before the transfer in exchange for 66,880 shares of its stock, but there is nothing in the record from which the fair market value of these shares or the property acquired by them may be determined. The board did not attempt to fix any value for these shares though they represented about an 83 per cent. interest in its assets. Without the determination of the fair market value of these 66,880 shares of stock on July 24, 1919, it was impossible to determine the capital gain realized on the sale of the Tex-Penn assets, even though the amount of the receipts is definitely fixed.

A similar situation exists in the cases of Benedum and Parriott.

Until the cost was determined, the gain could not be fixed and the tax determined. Burnet v. Houston, 283 U.S. 223, 51 S.Ct. 413, 75 L.Ed. 991.

The burden in these cases rested upon the commissioner to establish by competent evidence that the taxpayers realized a capital gain and the amount thereof. He has failed to do so.

A tax with deficiencies and interest of over $9,100,000 seems indefensible on any theory. The transaction was not taxable, and a judgment of no deficiency is to be entered by the Board of Tax Appeals.