**SCHNORBACH v. KAVANAGH, Collector of Internal Revenue.**

No. 1162.

United States District Court
W. D. Michigan, S. D.

Dec. 17, 1951.

Harrington, Waer, Cary & Servaas and Oscar E. Waer, all of Grand Rapids, Mich., for plaintiff.

Joseph F. Deeb, U. S. Atty., Kenneth P. Hansma, Asst. U. S. Atty., Theron Lamar Caudle, Asst. Atty. Gen., Andrew D. Sharpe and Lester L. Gibson, Special Assts. to the Atty. Gen., for defendant.

STARR, District Judge.

Plaintiff Philip W. Schnorbach, executor of the estate of his father, Philip P. Schnorbach, brings this suit to obtain the refund of a deficiency assessment of Federal estate taxes and interest thereon, in the amount of $54,578.72, which he paid under protest to the defendant collector of internal revenue.

Philip P. Schnorbach, a resident of Manistee, Michigan, died testate July 3, 1945. On July 15, 1946, his son, Philip W. Schnorbach, the duly appointed executor of the estate, filed a Federal estate tax return showing a gross estate of $216,331.46 and, after taking credit for certain claimed deductions, specific exemptions, and credit for

State inheritance taxes, reported and paid to the defendant collector a net tax of $31,200.31. This amount of tax was based upon the declared value, at the date of his father's death, of various assets, real and personal, belonging to or taxable as part of his estate, and on certain deductions for widow's allowance and for expenses of administration already incurred or estimated as likely to be incurred.

Upon review and audit of the return, the commissioner of internal revenue increased the declared values of certain assets and reduced or disallowed certain claimed deductions. This action resulted in a deficiency tax assessment of $50,992.27. On December 5, 1947, the plaintiff executor paid this deficiency assessment plus interest of $3,586.45, viz., a total of $54,578.72, under protest, to the defendant collector of internal revenue. He then filed a claim for a refund of the deficiency assessment and interest, which claim was denied, and on June 21, 1948, he began the present suit.

The principal questions presented in this case are: (1) Did the commissioner of internal revenue, in making the deficiency assessment, err in his determination of the value of certain assets of the Schnorbach estate, and (2) did he err in his reduction or disallowance of certain deductions claimed by the plaintiff executor?

In his claim for refund the executor took exception to every increase which the commissioner made in the value of assets and to every reduction or disallowance of claimed deductions. However, the trial in this court involved only the following items, the plaintiff having waived his exceptions and objections to all other items:

| | | Value declared by executor | Value determined by commissioner |
|---|---|---|---|
| 1. | 24,721⅓ shares stock Filer Fibre Co. Declared by executor at $3 a share; determined by commissioner at $10 a share.[1] | $74,164.00 | $247,213.33 |
| 2. | 70 shares stock National Lumberman's Bank of Muskegon, Michigan. Declared at $24 a share; determined by commissioner at $30 a share. | 1,680.00 | 2,100.00 |
| 3. | Account receivable: First National Bank of Manistee, Michigan, liquidating pool. | 750.00 | 1,500.00 |

4. Deduction for widow's allowance: The probate court of Manistee county, Michigan, granted the widow an allowance of $100 a week for one year, and she was paid $5,200. The executor claimed a deduction of the full $5,200; the commissioner reduced this to $4,800.

5. The executor claimed a deduction of $500 as the estimated amount of attorney fees; the commissioner disallowed this deduction.

---

I will first consider the question as to whether the commissioner erred in increasing the value of 24,721⅓ shares of the common stock of the Filer Fibre Company from $74,164 to $247,213.33, that is, in increasing the value from $3 a share to $10 a share.

Section 811 of the Internal Revenue Code, 26 U.S.C.A. § 811, provides in part:

"The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or in-

1. The deceased owned 3,260 shares, and his estate is also taxable on 21,361⅓ shares held jointly with his wife. An additional 100 shares held by the deceased as security for the note of one Robert C. Miller was acquired by and became part of the estate. Total shares taxable, 24,721⅓.

tangible, wherever ·situated, except real property situated outside of the United States— * * *.

"To the extent of the interest therein of the decedent at the time of his death".

Treasury Regulations 105, § 81.10, 26 CFR 81.10 (as amended by T.D. 5351 March 27, 1944) promulgated under the Internal Revenue Code, provides in part:

"Valuation of ·property—(a) General. The value of every item of property includible in the gross estate is the fair market value thereof at the time of the decedent's death. * * * The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell. The fair market value of a particular kind of property includible in the gross estate is not to be determined by a forced sale price. Such value is to be determined by ascertaining as a basis the fair market value as of the applicable valuation date of each unit of the property. For example, in the ·case of shares of stock or bonds, such unit of property is a share or a bond. *All relevant facts and elements of value as of the applicable valuation date should be considered in every case.* * * *

"(c) Stocks and bonds. * * *

"(2) In the case of stocks and bonds which are not listed upon an exchange, but are dealt in through brokers, or have a market, the fair market value shall be determined by taking the mean between the highest and lowest selling prices as of the valuation date; or, if there were no sales on that date, such value shall be determined by taking the mean between the highest and lowest sales on the nearest date before and the nearest date after the valuation date (both such nearest dates being within a reasonable period), and by prorating the difference between such mean prices to the valuation date, and by adding or subtracting, as the case may be, such prorated portion of the difference to or from the mean price obtaining on such nearest date before the valuation date. * * *

"(7) In cases in which it is established that the value per bond or share of any security·determined on the basis of selling or bid and asked prices as provided in this paragraph *does not reflect the fair market value thereof,* then some reasonable modification of such basis or other relevant facts and elements of value shall be considered in determining fair market value".

The stock of the Filer Fibre Company was not listed on any stock exchange, and sales were generally confined to private transactions between individuals or through stock brokers in Michigan.

The plaintiff contends that under the above statute and regulations the fair market value of the Filer Company stock held by Schnorbach should be determined on the basis of prices paid for stock of the company as evidenced by sales in the open market preceding and subsequent to his death on July 3, 1945. It appears that during the period between January 1st and June 11th of that year there were sales at prices ranging from $2.25 to $3.25 a share, and during the period from August 2d to November 29th there were sales at from $3 to $4.50 a share. It may be noted that there were no sales during the 52-day period between June 11th and August 2d.

On the other hand, the defendant contends that there was not a free, open, and active market for Filer Company stock in 1945, and that there were so few sales and the number of shares involved was so small in relation to the total number of shares outstanding as to make the market too restricted or "thin" to be used as the sole basis for determining fair market value of the Schnorbach stock. The defendant also contends that the sales prior to June 11th and subsequent to August 2d were not "within a reasonable period" before or after the valuation date of July 3, 1945, as required by the regulation quoted above; also that these sales were not between informed sellers and buyers. The defendant further claims that, because there was not a free, open, and active market for the Filer Company stock in 1945, it is necessary in determining the fair mar-

ket value of the Schnorbach holdings, to take into consideration not only the mean sale price as evidenced by the few sales during this period, but also the company's net worth, its improved financial condition, the increased book value of its stock, its dividend-earning capacity, and all other relevant factors having a bearing upon the fair market value.

The Filer Fibre Company, a Michigan corporation, began its operations in 1918. The company manufactured sulphate (Kraft) pulp and Kraft paper. The deceased, Philip P. Schnorbach, was secretary and general manager of the company until about 1926, when he became president and general manager. He continued in that capacity until his death, and it reasonably appears that during this time he directed the business and the financial policies of the company. At the time of his death the company had an authorized capital stock of 200,000 shares of common stock of the par value of $5 a share, of which 133,265 shares were issued and outstanding.[2] The several members of the Schnorbach family held 28,153⅗ shares, or about 21.1 per cent. of the shares outstanding; the members of the Filer family held 44,500 shares or about 33.4 per cent.; and Mrs. R. W. (Lottie B.) Smith held 10,000 shares or about 7.5 per cent.; that is, 82,653⅗ shares or about 62 per cent. of the total outstanding stock was held by these three families. The remaining 50,611⅕ shares were held by the 171 other stockholders. It is significant to note that during several years prior to Schnorbach's death those stockholders who were active in the management of the company and who, it may be assumed, knew of the improvement in its financial condition, did not sell or dispose of their stock but, in fact, increased their holdings. For example, during the period from December, 1939, to July 3, 1945, the members of the Schnorbach family increased their holdings from 25,837½ to 28,153⅗ shares. The stock record of the company indicates that during this period only a few stockholders with relatively small holdings were offering their stock for sale.

It is difficult to determine with accuracy just what transactions occurred in the sale of the Filer Company stock during the six-months' period prior to Schnorbach's death. At first glance the brokers' reports of sales of Filer Company stock during this period would seem to indicate 24 transactions involving more than 8,000 shares of stock. However, an analysis of the depositions and the stock transfer record reveals that, aside from brokers' purchases and sales, only 3,292 shares, or less than 2½ per cent. of the outstanding shares, were actually involved and that there were only seven individual sellers and twelve individual purchasers. The recorded sales for the month of January, 1945, are typical and illustrative: On January 13th Frank Granger sold 200 shares of Filer Company stock to White, Noble & Company, brokers in Grand Rapids, who made the purchase for their own account; White, Noble sold these shares to Wm. C. Roney & Company, Detroit brokers, for their account; and Roney & Company sold them to Richard W. Lambrecht. The other 100 shares of Filer Company stock traded in January came from George R. Hollister (or Esther Nash) and traveled through the same brokers to the same ultimate purchaser. As another illustration we may examine the three sales of a block of 1,120 shares on March 15, 1945. On the face of it there were three transactions involving 3,360 shares, but the stockholders' ledger reveals that the only transfer was 1,120 shares from Joel C. Lindberg to Archie and Mrs. Florence LaPointe through brokers. The sales of Filer Company stock subsequent to Schnorbach's death, while not determinative of the fair market value of his stock at the time of his death, do indicate a steadily increasing market value.

The determination of the value of a block of stock on a certain date always presents a question of fact, and each case must be decided on the basis of its particular facts. Heiner v. Crosby, 3 Cir., 24

2. In 1937 the par value of the stock of the Filer Company had been reduced from $100 to $5 a share.

F.2d 191. It is well recognized that sales of a stock listed on a stock exchange offer a far better criterion of fair market value than do miscellaneous sales of an unlisted stock. Estate of McKitterick v. Commissioner, 42 B.T.A. 130, 136, 137. The Treasury Department regulation hereinbefore quoted defines "fair market value" as the price at which the stock would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell. In Robertson v. Routzahn, 6 Cir., 75 F.2d 537, 539, the court defined fair market value as "the price * * * that the property will bring at a voluntary sale to a willing buyer, *both the seller and buyer having adequate knowledge of the material facts affecting the value.*"

See also W. T. Grant Co. v. Duggan, 2 Cir., 94 F.2d 859, 861; Hazeltine Corporation v. Commissioner of Internal Revenue, 3 Cir., 89 F.2d 513, 519; Commissioner of Internal Revenue v. Robertson, 6 Cir., 75 F.2d 540; Stiles v. Commissioner of Internal Revenue, 5 Cir., 69 F.2d 951; Curtiss v. Commissioner, 5 Cir., 57 F.2d 847; Union Nat. Bank of Pittsburgh v. Driscoll, D.C., 32 F.Supp. 661.

In Crawford v. Helvering, 63 App.D.C., 140, 70 F.2d 744, 745, 746, the court said: "It is generally said by most of the courts which have had to deal with the subject that there is no definite formula by which to determine fair market value as that term is used in the tax statutes. The question as all agree, is necessarily one of fact to be determined by the evidence. In many cases it is said to be the price which a ready buyer not compelled to buy would pay and a ready seller not compelled to sell would take. But after all, the question of fact is to be determined from the circumstances. * * * Actual sales may be shown, as may also intrinsic value; book value may be considered, as also earning capacity. These are all elements which tend to the ascertainment of fair market value, and, when considered together or singly, may establish the fact."

From the record it may reasonably be assumed that only Schnorbach, and possibly a few stockholders who directed the business of the company, knew of its improved financial condition and knew the real value of their stock in 1945. That prior to his death Schnorbach recognized that his stock had increased substantially in value is evidenced by the 13th paragraph of his will executed June 26, 1945, in which he stated: "A great portion of my estate is in stock of the Filer Fibre Company, partly in joint ownership with my wife, and it is my desire that the Filer Fibre Company business should be carried on, or, on the other hand, if the book value price (then about $11.50 a share) could be obtained, I would recommend that the stock be sold."

From examination of the form of annual report which the Filer Company sent to its stockholders in 1944 and prior years, it is not unreasonable to assume that the majority of the smaller stockholders were not sufficiently experienced in business and corporation accounting to determine from such reports the greatly improved financial condition of the company, its increased earnings, and the real, intrinsic value of their stock. The stock was unlisted, and practically the only market for it was through brokers. Of the 171 smaller stockholders of the Filer Company, there were undoubtedly a few who, for various reasons, sold their stock in 1945 and prior years at whatever price the brokers were offering. From the evidence it reasonably appears that the few stockholders who sold their relatively few shares on the market in 1945 before the valuation date at prices ranging from $2.25 to $3.25 a share did not have adequate knowledge of the material facts affecting the value of their stock, and in particular had no knowledge whatever of the negotiations by Schnorbach in 1944 and 1945 for sale of all the outstanding stock of the company at a much higher price. These sales were apparently between uninformed sellers and uninformed buyers.

The court concludes that the few stockholders who sold their Filer Company stock on the market in 1945 did not have "adequate knowledge of the material facts affecting the value" of their stock and did

not have a free, open, and active market for the sale of their stock. Therefore, the sales made by these stockholders did not reflect the fair market value of the stock and do not establish a proper basis for determining the fair market value of the 24,721⅓ shares in question at the time of Schnorbach's death. To determine this value other factors must be taken into consideration, that is, the greatly improved financial condition of the company, its dividend-earning capacity, the increased book value of the stock, and all other pertinent facts relating to or having a bearing upon the question of fair market value. Hummel-Ross Fibre Corporation v. Commissioner of Internal Revenue, 4 Cir., 79 F.2d 474, 478. Events which occurred subsequent to the valuation date, insofar as they may have some bearing on the issue of the fair market value on that date, may properly be considered. Tex-Penn Oil Co. v. Commissioner of Internal Revenue, 3 Cir., 83 F.2d 518, 524. Therefore, some consideration may be given to the fact that the Filer Company, at least to some extent as the result of negotiations by Schnorbach and his agents in 1944 and 1945, concluded arrangements in December, 1945, for the sale of all of its outstanding stock at $10 a share.

In the following cases the courts have considered the number of stock sales and the percentage of the total outstanding stock of the corporation involved in these sales, in determining whether there was a free, open, and active market for the stock; they have also considered whether the price at which these sales were made should determine the fair market value of the shares to be valued, or whether other pertinent facts relative to the financial condition of the company and the actual worth of its stock should be considered. In Joseph Soss v. Commissioner of Internal Revenue, 1940, par. 40,531 P-H Memo BTA (not published in Board of Tax Appeals Reports), the only issue to be determined was the fair market value of 73,500 shares of stock of the Soss Manufacturing Company on July 27, 1937. 195,000 shares of Soss Company stock were outstanding, and on the valua-tion date the petitioner and his family owned a total of 97,987 shares. The remaining 97,013 shares were held by 948 other stockholders. The stock was listed on the New York and Chicago curb exchanges, and stock had been transferred on the New York exchange in the following amounts and for the following prices:

| Month | No. of shares sold | High | Low |
|---|---|---|---|
| February, 1937 | 4,100 | 8–5/8 | 7–5/8 |
| March | 9,300 | 8–1/4 | 6–1/2 |
| April | 3,500 | 7–1/2 | 5–1/2 |
| May | 1,700 | 6–3/4 | 6–1/8 |
| June | 2,100 | 6–1/2 | 6–1/8 |
| July | 8,200 | 8–1/8 | 6–5/8 |
| August | 40,100 | 10–3/4 | 8 |
| September | 9,700 | 9–7/8 | 7–1/4 |
| October | 9,100 | 8–1/4 | 4–1/8 |
| November | 3,800 | 7–3/8 | 6–1/8 |
| December | 1,100 | 6–3/8 | 5–3/8 |
| January, 1938 | 800 | 6–3/4 | 5–1/2 |

The commissioner determined a fair market value of $7.25 a share, that being the mean between 7⅛ and 7⅜, the New York curb bid-and-asked prices on the valuation date. The tax court refused to accept the market price as the fair market value, considered all data pertinent to the worth of the corporation and the value of its stock, and determined that the stock had a fair market value on the valuation date of $5.75 a share.

In Estate of Telling v. Commissioner of Internal Revenue, 1944, par. 44,222 P-H Memo TC (not published in Tax Court Reports), the issue for determination was the fair market value of 37,637 shares of the stock of the S. M. A. Corporation held by the deceased at the time of his death on January 26, 1938. On that date the corporation had outstanding 212,394 shares of common stock, and the deceased and his family controlled more than 50 per cent. The stock was listed on the Cleveland exchange, and in the year preceding the decedent's death had been transferred in the following amounts at the following prices:

| Month | No. of shares sold | High | Low |
|---|---|---|---|
| January, 1937 | 289 | 19 | 18 |
| February | 684 | 19 | 17 |
| March | 295 | 18–3/4 | 17–1/2 |
| April | 513 | 16–1/2 | 15 |
| May | 115 | 15–1/2 | 15 |
| June | 20 | 15 | 15 |
| July | 150 | 15 | 13–1/2 |
| August | 35 | 13–1/4 | 12 |
| September | 661 | 12–1/4 | 10 |
| October | 438 | 11 | 10 |
| November | 362 | 10–1/2 | 10 |
| December | 743 | 12 | 10 |
| January, 1938 | 616 | 11 | 10–1/2 |

The stock was valued by the administratrix at $10 a share, based on the price quotations of the market at the date of the decedent's death. The court refused to accept the mean market price as the fair market value, considered all data pertinent to the worth of the corporation and the intrinsic value of the stock, and determined that it had a fair market value on the valuation date of $14 a share.

The cases of Estate of Poley v. Commissioner of Internal Revenue, 1947, par. 47,-065 P-H Memo TC (not published in Tax Court Reports), affirmed by the Court of Appeals for the third circuit, 166 F.2d 434, and Helvering v. Maytag, 8 Cir., 125 F.2d 55, both involved the determination of the fair market value of large blocks of stock. In both cases there were numerous sales of the stock to be evaluated, but these sales involved only a relatively small portion of the total number of shares outstanding. In these cases the market price of the stock on the valuation date was held not to be conclusive of fair market value, and in each case the court determined the fair market value by examining all pertinent data concerning the worth of the corporation and the actual value of its stock. In Heiner v. Crosby, 3 Cir., 24 F.2d 191, 193, the court said: "Sales made at a particular time and place may be significant, but the price paid is not necessarily decisive of fair market price or value. The fact of sales, in itself and without regard to the circumstances under which the sales were made, does not conclusively establish either statutory fair market price or value. Sales made under peculiar and unusual circumstances, such as sales of small lots, forced sales, and sales in a restricted market, may neither signify a fair market price or value".

See also Estate of Telling v. Commissioner of Internal Revenue, supra.

At the rate of trading in Filer Company stock during the six months prior to Schnorbach's death, it would have taken about four years to dispose of the 24,721⅓ shares to be valued, which constituted about 18.5 per cent. of the total outstanding stock of the company. Viewing the situation realistically, it appears that this amount of stock could not have been sold on the valuation date or within a reasonable time thereafter. In other words, there was not an active and open market which could have absorbed the Schnorbach holdings. In Helvering v. Maytag, 8 Cir., 125 F.2d 55, the court said at page 63: "It is established that the size of a block of listed stock may be a factor to be considered in its valuation for gift or estate tax purposes. Where, as in this case, the taxpayer affirmatively shows that a block of listed stock to be valued is very great in comparison with the amounts of the stock which have been traded in on the exchange where it is listed, that the block of stock could not be sold on such market at its quoted prices within a reasonable time by skilled brokers following prudent practices for liquidation and that the true value of the block of stock is in fact different from the price quotations, then the taxpayer is entitled to have all other proper evidence of the value of the block of stock considered together with the market quotations." See authorities cited.

As the court has concluded that there was not a free, open, and active market for the Filer Company stock in 1945 and that the mean sale price of the relatively few shares sold on the market in that year did not reflect the fair market value of the Schnorbach holdings on the valuation date, all other relevant facts and elements of value will be considered in determining the fair market value of the stock, and the following provision of Treasury Regulations 105, § 81.10 (as amended by T. D.

5351 March 27, 1944) becomes applicable: "In cases in which it is established that the value per bond or share of any security determined on the basis of selling or bid and asked prices as provided in this paragraph *does not reflect the fair market value thereof*, then some reasonable modification of such basis or other relevant facts and elements of value shall be considered in determining fair market value."

■ Dr. Ralph Badger, an economist and investment counselor of broad training and experience, who was called as a witness by the defendant, testified relative to several methods of determining the fair market value of the Schnorbach block of Filer Company stock. On the basis of the ratio of the sale price of $10 a share to Continental Can Company to the estimated book value per share as of November 28, 1945, Dr. Badger determined the fair market value to be $9.67 a share on the valuation date. On the basis of an adjustment of the sale price of $10 a share by the use of Dow-Jones industrial stock price averages, Dr. Badger determined a derived value of $8.63 a share. On the basis of earnings, book value, current dividend-paying ability, and sale price, in ratio to those of comparative companies, Dr. Badger determined the stock to have a value of $9.42. These and other derived values placed by Dr. Badger on the Filer Company stock held by the Schnorbachs through the use of different theories of valuation, while entitled to consideration, are not conclusive as to the fair market value of that stock on the valuation date. Consideration should also be given to the fact that the earned surplus of the company increased from $422,300.82 in 1940 to $837,872.29 in 1945; that during this period net current assets of the company increased from $181,279.70 to $420,296.55; and that during the same period the book value of the company's stock increased from $8.30 to $11.57 a share. Consideration should also be given to the company's earnings, which were at the rate of 97 cents a share in 1942, 41 cents a share in 1943, 52 cents in 1944, and 81 cents in 1945, or an average of 67 cents a

share for the four-year period.[3] Although the only dividends paid were 10 cents a share in 1941 and 10 cents in 1945, the balance sheets indicate that the company's funded debt had been considerably reduced and that its financial condition was steadily improving. There was testimony indicating that prior to his death Schnorbach had declined offers of $5 and $7.50 a share for all of the outstanding stock of the Filer Company and that he had asked $11.[4] It may reasonably be assumed that he was endeavoring to sell all the stock, including his own holdings, at what he considered to be its fair market value.

■ However, in connection with the foregoing, consideration should also be given to the fact that Schnorbach's block of 24,721⅓ shares was probably unmarketable on the valuation date, because there was apparently no active market which could immediately have absorbed that amount of stock. This fact of unmarketability would undoubtedly lower the market value of the stock. Commissioner of Internal Revenue v. Shattuck, 7 Cir., 97 F.2d 790, 792. This is not an application of the so-called "blockage rule," which relates to the impact on an existing market of the offer for sale of a large block of shares. That rule recognizes that the offer of a large block of stock will usually force the price down, but as the rule is predicated upon the premise of an existing open market for the block of stock offered, the rule is not applicable in the present case, where there was no ready market for the entire Schnorbach block.. This precludes the application of the blockage rule but is, nevertheless, an evidentiary fact which should be considered in determining fair market value. Furthermore, there is evidence which indicates that in the fall of 1945 several sources upon which the Continental Can Company depended for a supply of raw materials ceased to be available, and that this fact prompted it to purchase all the outstanding stock of the Filer Company, which could supply it with raw materials. This circumstance, which arose after the death of Schnorbach, undoubtedly had a

3. See testimony of witness Alfred Harris.

4. See testimony of witnesses Kerns Wright and Frank X. Meiners.

coercive effect upon Continental Can and induced it to pay more for the stock of the Filer Company than it would have been willing to pay on the valuation date. For that reason and the fact that the sale to Continental Can was far remote from the valuation date of July 3, 1945, the court is convinced that the price of $10 a share paid by Continental, though entitled to some consideration in view of previous negotiations by Schnorbach, is certainly not conclusive as to the fair market value of the 24,721⅓ shares in question on the valuation date.

■■ In the present action to recover the deficiency assessment and interest this court does not sit as an appellate tribunal reviewing the decision of the commissioner of internal revenue, but hears and determines the case *de novo*. Jenkins v. Smith, D.C., 21 F.Supp. 251, 253. Therefore, the court must determine from the evidence presented the issue of fact as to the fair market value on July 3, 1945, of the 24,721⅓ shares of Filer Company stock held by the Schnorbachs. Helvering v. Safe Deposit & Trust Co. of Baltimore, 4 Cir., 95 F.2d 806; Knobloch v. Smith, D.C., 25 F.Supp. 156. The court is convinced that neither the value of $3 a share declared by the plaintiff executor nor the $10 a share determined by the commissioner reflects the fair market value of the stock in question. By giving consideration to all of the relevant facts which may properly be considered, as set forth and discussed in this opinion, the court concludes that the Filer Company stock in the Schnorbach estate had a fair market value of $6.50 a share on the valuation date.

■ I now turn to the item of the 70 shares of stock of the National Lumberman's Bank of Muskegon, Michigan, which the plaintiff executor declared at a value of $24 a share and which was increased by the commissioner to $30 a share. The evidence as to the value of this stock is very meager. However, there is evidence which would reasonably justify the executor's determination of a value of $24 a share. The court accordingly determines the fair market value to be $24 a share.

The next item to be considered is an account receivable arising in connection with the liquidation of the National Bank of Manistee, Michigan. The plaintiff executor determined the value of this account receivable to be $750, and the commissioner increased it to $1,500. It appears that the First National Bank of Manistee was closed at the time of the national bank holiday in 1933 and was never reopened. It also appears that some time prior to April 1, 1936, the deceased, Philip P. Schnorbach, and other business men of Manistee submitted a plan to the comptroller of the currency whereby stockholders were to advance funds which, with the bank's cash on hand, were to be used to pay all depositors. The deceased was a stockholder of the bank and contributed $5,000 to this fund. The plan provided that the frozen assets of the bank were to be transferred to a trustee and that the trustee was to liquidate these assets and distribute the proceeds to the stockholders who had made the advances. Prior to his death Schnorbach had received liquidating dividends from the trustee in the amount of $3,500 to apply on his advance of $5,000. By July, 1945, the assets in the hands of the trustee had been liquidated with the exception of a brick building in Manistee, the ground floor of which had been occupied by the bank, and with the exception of a real estate second mortgage on which there was a balance due of $2,625. The income from the brick building during the 10 years preceding 1945 had apparently been no more than sufficient to meet the expense of repair and maintenance of the building. At the time of Schnorbach's death on July 3, 1945, it was obviously quite impossible to determine what amount, if any, would ever be realized from this building and second mortgage. In connection with the liquidation proceedings the late Judge Fred M. Raymond in January, 1946, entered an order directing the trustee to offer the remaining assets of the liquidating pool for sale on sealed bids to be opened February 9, 1946. The evidence indicates that two bids were received, one for $12,506 for the building and $2,710.10 for the second mortgage, and

the other for $14,000 for the building and nothing for the mortgage. The bids were not accepted, and the sale of these two items of property was postponed for many months. In August, 1946, a bid of $16,000 was received for the building and a bid of $1,000 for the second mortgage. The matter was again adjourned for further bids, and finally in September, 1946, the building was ordered sold for $21,050 and the second mortgage for $2,000. The amount realized from these sales was sufficient to pay Schnorbach and other contributors the full balance remaining due on their original contributions without interest, and about 14 months after his death the executor of Schnorbach's estate received a final liquidating dividend of 30 per cent. amounting to $1,500.

The question presented is—what was the fair market value of this account receivable item on the valuation date, July 3, 1945? The value of the item at that time was problematical. The fact that the Schnorbach estate eventually realized $1,500 from this account receivable may be considered, but under all the facts and circumstances it is of little evidentiary value in determining the fair market value on the valuation date. After consideration of all the relevant facts relating to this item the court determines that the fair market value of this account receivable was $750 on the valuation date.

The next item to be considered is the allowance to the widow of the deceased. The probate court of Manistee county, Michigan, in pursuance of Act No. 288, ch. 2, § 68, Pub.Acts 1939, Comp.Laws Mich.1948, § 702.68, granted the widow an allowance of $100 a week for one year and, in accordance with this order, the estate paid her $5,200. The executor claimed a deduction for the full $5,200, but the commissioner reduced it to $4,800. The above State statute provides as follows: "The widow and minor children * * * of a deceased man shall have such reasonable allowances out of the real and personal estate of such deceased as the probate court shall judge necessary for their maintenance during the progress of the settlement * * * according to their circum-stances but never for a longer period than until their shares, in the estate shall be assigned to them".

In the present case the amount of the allowance to the widow is to be determined under the laws of the State of Michigan wherein the Schnorbach estate was being administered. Roth v. Wardell, 9 Cir., 77 F.2d 124. Considering the fact that the Schnorbach estate apparently amounted to more than $200,000 according to the return of the executor and to more than $300,000 as revalued by the commissioner, and the fact that the probate court, in pursuance of the above statute, determined the allowance to be necessary, this court finds no justification for the commissioner's reducing the deduction for widow's allowance to $4,800. The court accordingly determines that the estate is entitled to a deduction of the $5,200 paid to the widow.

The last item to be considered relates to the amount of attorney fees which is properly allowable as a deduction in the determination of the estate tax. In his return the executor claimed a deduction of $500 for attorney fees, but this item was disallowed by the commissioner. The determination of the amount of attorney fees which is properly deductible as a necessary expense in the administration of an estate is a matter within the discretion of the court. An amount should be allowed which the court, under all the facts and circumstances of a particular case, deems fair and reasonable. Mr. Oscar E. Waer, an attorney of broad experience and recognized ability, who represents the estate, testified at some length regarding the work that he had performed for the Schnorbach estate during the past several years and that he would be required to perform in connection with the closing of the estate. He testified that in his opinion a reasonable charge for his services, past and future, would be the sum of $10,000. There is no positive rule which can be followed in the determination of the reasonableness of attorney fees. Each case must be determined upon its own facts and circumstances, with consideration given to the amount involved, the time and effort expended by attorneys, the seriousness of the problems involved,

the results obtained, and consideration should also be given to the experience and ability of the attorneys. Sampsell v. Monell, 9 Cir., 162 F.2d 4; Lurie v. Steckel, D.C., 79 F.Supp. 723; Rogers v. Hill, D.C., 34 F.Supp. 358, 363.

The court is of the opinion that under all the facts and circumstances of the present case the allowance of attorney fees in the sum of $7,500 would be fair and reasonable. The court accordingly concludes that, in determining the Federal estate tax, the Schnorbach estate is entitled to a deduction of $7,500 for attorney fees.

There is one additional item which should be mentioned in this opinion. The present suit was begun June 21, 1948. In the course of the trial the plaintiff put in evidence another claim filed November 20, 1950, for a refund of the further sum of $5,841.61 paid to the defendant collector on August 9, 1949. The question presented regarding this item is whether the plaintiff's claim to this refund may be considered and determined in the present suit. It should be noted that no claim to this refund is asserted in the plaintiff's complaint; also that the tax was paid and the claim for refund filed long after the present suit was begun. Title 26, U.S.C., Internal Revenue Code, § 3772 provides in part:

"No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected * * * until a claim for refund or credit has been duly filed with the Commissioner, according to the provisions of law in that regard, and the regulations of the Secretary established in pursuance thereof. * * *

"No such suit or proceeding shall be begun before the expiration of six months from the date of filing such claim unless the Commissioner renders a decision thereon within that time, nor after the expiration of two years from the date of mailing by registered mail by the Commissioner to the taxpayer of a notice of the disallowance of the part of the claim to which such suit or proceeding relates."

In view of the foregoing facts relative to the time of filing of this claim for a refund of $5,841.61 and the provisions of the above statute, it is clear that the claim cannot properly be considered in the present suit.

On the basis of the court's findings and conclusions as to the fair market value of the several items of property and as to the deductions allowable in the determination of the Federal estate tax, the parties to this suit should, within the period of 60 days from the date hereof, recompute and agree upon the correct amount of the Federal estate tax and upon the part or portion of the deficiency assessment and interest which should be refunded to the plaintiff executor. The plaintiff shall be entitled to interest upon the amount of the refund as provided by law.

The court retains jurisdiction of this action, and in the event the parties are unable to agree upon the correct amount of the Federal estate tax and upon the part or portion of the deficiency assessment and interest which should be refunded to the plaintiff executor, the court, upon the application of either party, will take such further proceedings as may be necessary to determine these amounts.

Judgment will be entered in accordance with the foregoing opinion.